Justice KELSEY, dissenting.
 

 The majority holds that a trial judge, not a jury, must determine whether an insurer committed a bad-faith breach of contract justifying an award of attorney's fees under Code § 38.2-209(A). I recognize the well-worn path taken by the majority, but I cannot
 follow. The specific legal question presented by this case, while seemingly narrow, touches on far broader issues-and the answer given by the majority adds weight to a modern jurisprudential trend that I lament.
 
 [1]
 
 I.
 

 REVI, LLC filed a first-party breach of contract claim against Chicago Title Insurance Company (the insurer). REVI claimed that the insurer had breached, in bad faith, its contractual obligation to pay REVI's claim on the insurer's policy of title insurance. At a bifurcated trial, a jury agreed with REVI, awarding REVI $1,241,000 in benefit-of-the bargain damages and $442,000 in attorney's fees.
 

 After receiving both verdicts, the trial judge sua sponte vacated the jury's award of attorney's fees, holding that Code § 38.2-209(A) provides that the issue of bad faith in breach of contract actions can only be decided by a judge, not a jury, because the statute provides that "the court," and not the "jury," may make the award. The trial judge then reconsidered the evidence de novo and held that the insurer had not committed a bad-faith breach warranting an award of attorney's fees.
 

 REVI filed a petition for appeal challenging (i) the trial judge's holding that only a judge, not a jury, could decide the bad-faith issue and (ii) the trial judge's de novo factual finding that the insurer did not commit a bad-faith breach of the insurance contract. We awarded REVI an appeal on its first, but not its second, assignment of error.
 

 II.
 

 On appeal, REVI argues that the reference to "the court" in Code § 38.2-209(A) is ambiguous and should be interpreted to include a jury. I agree.
 

 A.
 

 Code § 38.2-209(A) authorizes "the court" to determine whether an insurer commits a bad-faith breach of contract and to award attorney's fees.
 

 The traditional meaning of the term "court," as Sir Edward Coke defined it, is simply "a place where justice is judicially administered." 1 Edward Coke, The First Part of the Institutes of the Laws of England, or, a Commentary upon Littleton § 73, at 58 (10th ed. 1703).
 
 [2]
 
 Unadorned by context, the ordinary meaning of the term does not specify whether a judge or jury will decide the case. For example, when two drivers walk away from a car wreck, and one says to the other, "I'm going to take you to court" or "You'll see me in court," most people would not think, "Well, thank heavens a judge and not a jury will be deciding the case." The ordinary use of the term, therefore, is imbued with ambiguity.
 
 [3]
 
 The contention
 otherwise is as unconvincing as it is unconventional.
 

 While it is true that the term "[c]ourt is frequently used as a metonymic substitute for judge," Bryan A. Garner, A Dictionary of Modern Legal Usage 231 (3d ed.2011) (emphasis omitted), that meaning, some say, can be attributed to "the sometimes-strange jargon of jurists,"
 

 id.
 

 (quoting John A. Jenkins, The Litigators 165
 (1989)). The more traditional view, widely recognized by our Founders, declares that "[j]uries form, with a few exceptions, another constituent part of courts." 2 The Works of the Honourable James Wilson 305 (Bird Wilson ed., 1804);
 
 [4]
 

 see, e.g.,
 
 Black's Law Dictionary 318 (5th ed.1979) (defining "court" as "[a] body organized to administer justice, and including both judge and jury"). This view continues to resonate as authoritative in modern times.
 
 See, e.g.,
 

 Lorillard v. Pons,
 

 434 U.S. 575
 
 , 579 n. 5, 582-83,
 
 98 S.Ct. 866
 
 ,
 
 55 L.Ed.2d 40
 
 (1978) (holding that a federal statute authorizing "the court" to grant legal or equitable relief could fairly be read to afford a right to jury trial on claims for lost wages).
 
 [5]
 

 Fifty years ago, we applied the traditional view in
 
 Beasley v. Bosschermuller,
 

 206 Va. 360
 
 ,
 
 143 S.E.2d 881
 
 (1965). Specifically, we held that a statute authorizing "courts" to take judicial notice of the statutory tables of speed and stopping distances of vehicles must be understood "to include juries within the meaning of the word 'courts.' "
 
 206 Va. at 366
 
 ,
 
 143 S.E.2d at 886
 
 . We came to this conclusion because "in cases triable by a jury the word 'court' employed in a statute includes the jury as a constituent part."
 

 Id.
 

 The majority holds that the traditional view must give way when the statutory context suggests otherwise. I could not agree more. There are countless examples of this.
 
 See, e.g.,
 

 Ingram v. Commonwealth,
 

 62 Va.App. 14
 
 , 24,
 
 741 S.E.2d 62
 
 , 67 (2013) (holding that "court," used in the context of a statute governing involuntary treatment orders under Code § 37.2-1101(A), means a court sitting without a jury). But nothing in the Code of Virginia or, more specifically, Title 38.2, provides the contextual support for the interpretation the majority imputes to Code § 38.2-209(A).
 

 In dozens of statutes throughout the Code, the General Assembly speaks of the "court" sitting "without a jury."
 
 [6]
 
 In each of these, "without a jury" would be superfluous if, as the majority contends, the term "court" necessarily means a judge deciding the issue entirely on his own. It is true that other statutes use the term "court" to imply court
 
 qua
 
 judge. But many of these statutes specifically
 mention "jury" as distinct from " court," so as to make clear that, in those particular contexts, "court" refers only to the constituent part of judges.
 
 [7]
 
 In other instances, even within Title 38.2, the General Assembly explicitly refers to the "judge" as distinct from the "court," thus employing a broader meaning of "court."
 
 [8]
 
 To the extent that any inference can be drawn from these
 statutes, it is that when "court" designates only a judge, the legislature typically reinforces that meaning by specifically distinguishing the "court" from the "jury."
 

 Suffice it to say, the host of discordant uses of these statutory terms-particularly the inconsistent usage of the term "court" within Title 38.2-is alone enough to dissuade me from accepting the majority's conclusory assertion that the term "court" has a "commonly accepted definition" that necessarily excludes juries.
 
 See
 

 Ante
 
 at ----, 776 S.E.2d at 812-13. The majority implicitly concedes the point by relying heavily on the legislative history of Code § 38.2-209 in an unorthodox effort to vouch for this "commonly accepted definition."
 
 Ante
 
 at ----, 776 S.E.2d at 812-13.
 
 [9]
 

 I do not see how the legislative history provides the majority with the confidence it seeks. If anything, I would think it would do just the opposite. The General Assembly amended and recodified the insurance laws (formerly Title 38.1) as Title 38.2 in 1986.
 
 See
 
 1986 Acts ch. 562. Prior to that recodification, the predecessor statute to Code § 38.2-209 specifically provided that "the trial judge after verdict" should decide the bad-faith issue and that fees could be awarded "if it is determined by such trial judge in such case" that the insurer has not acted in good faith. 1982 Acts ch. 576 (as enacted, former Code § 38.1-32.1 (Cum. Supp. 1982), quoted in
 
 CUNA Mut. Ins. Soc'y v. Norman,
 

 237 Va. 33
 
 , 38,
 
 375 S.E.2d 724
 
 , 726 (1989) ). The 1986 amendment deleted the phrases "the trial judge after verdict" and "if it is determined by such trial judge in such case,"
 

 replacing "trial judge" with "the court."
 
 Compare
 
 former Code § 38.1-32.1
 
 with
 
 Code § 38.2-209(A).
 

 In Virginia, "a presumption exists that a substantive change in law was intended by an amendment to an existing statute,"
 

 Commonwealth v. Bruhn,
 

 264 Va. 597
 
 , 602,
 
 570 S.E.2d 866
 
 , 869 (2002) (quoting
 
 Virginia-American Water Co. v. Prince William Cty. Serv. Auth.,
 

 246 Va. 509
 
 , 517,
 
 436 S.E.2d 618
 
 , 622-23 (1993) ), and thus, we should "assume that the General Assembly's amendments to the law are purposeful and not unnecessary or vain,"
 
 Virginia-American Water Co.,
 

 246 Va. at 517
 
 ,
 
 436 S.E.2d at 623
 
 .
 

 That presumption surely applies here. If "the court" means exactly the same thing as the phrase "the trial judge after verdict," then the 1986 amendment accomplished nothing except to make unclear what had previously been perfectly clear.
 
 See
 
 Appellant's Br. at 16-17. If we are to draw any inferences at all from the amendment, it should be toward giving the new language some meaning-as opposed to none at all. That is particularly true given our prior observation that "in cases triable by a jury the word 'court' employed in a statute includes the jury as a constituent part."
 
 Beasley,
 

 206 Va. at 366
 
 ,
 
 143 S.E.2d at 886
 
 .
 

 The majority makes much over the fact that the Code Commission's Report to the General Assembly does not specifically call attention to the amendment as "substantive."
 
 Ante
 
 at ----, 776 S.E.2d at 813. But that is a peculiarly thin basis on which to rebut the judicial presumption to the contrary.
 
 [10]
 
 The Report plainly states that the recodification was a "complete rewrite" of the insurance laws and made "substantive changes" to it.
 
 [11]
 
 Although the Report summarizes certain "principal changes,"
 
 id.,
 
 it is highly speculative to assume that not expressly mentioning the amendment of former Code § 38.1-32.1 to
 Code § 38.2-209 as a "principal" change somehow proves that the staffers who wrote the Report thought that the amendment was a non-substantive, purely stylistic edit.
 
 [12]
 
 And, frankly, I am not sure that it should matter if they did. The judicial function of interpreting statutes must operate at a higher level than this. It is the legislative intent of the General Assembly, not the Code Commission, that we must discern.
 
 See
 

 Lavery v. Automation Mgmt. Consultants, Inc.,
 

 234 Va. 145
 
 , 149 n. 3,
 
 360 S.E.2d 336
 
 , 339 n. 3 (1987) ("Revisers' " notes accompanying a statute are " not law and they cannot control the exercise of this Court's obligation to say what the law is.").
 

 B.
 

 As useful as they may be, canons of construction are not infallible. "Canons of construction need not be conclusive and are often countered, of course, by some maxim pointing in a different direction."
 

 Circuit City Stores, Inc. v. Adams,
 

 532 U.S. 105
 
 , 115,
 
 121 S.Ct. 1302
 
 ,
 
 149 L.Ed.2d 234
 
 (2001). When this occurs, as is arguably the case here, courts should acknowledge the analytical stalemate and search for a tie-breaker principle. Virginia judges need not go very far to find one that directly addresses this case.
 

 Authored by George Mason, the 1776 Virginia Declaration of Rights declared that "the ancient trial by jury is preferable to any other" and thus "ought to be held sacred." Virginia's Declaration of Rights, § 11, 9 Hening's Statutes of Virginia 109, 111-12 (1776). This sacred, constitutional preference survives to this day as Article I, Section 11, of the Constitution of Virginia and constitutes a meta-canon recognizing the Commonwealth's venerated tradition of viewing the citizen jury as a constituent and essential part of the judiciary-"preferable" to any other.
 

 Id.
 

 Our faith in this premise comes from the English common law, so deeply embedded in the Commonwealth's history,
 
 [13]
 
 which declared juries to be "the best investigators of truth, and the surest
 guardians of public justice." 3 William Blackstone, Commentaries *380;
 
 see also
 
 The Works of the Honourable James Wilson,
 
 supra,
 
 at 315-17. "So tight was the linkage between trial and jury that there was in fact no such thing as nonjury trial at common law. In any case involving a disputed issue of fact, bench trial (adjudication by the judge sitting without a jury) was unknown until the later nineteenth century." John H. Langbein,
 
 The Disappearance of Civil Trial in the United States,
 

 122 Yale L.J. 522
 
 , 524 (2012).
 

 The citizen jury was understood as "the 'lower judicial bench' in a bicameral judiciary"
 
 [14]
 
 and "the democratic branch of the judiciary power."
 
 [15]
 
 Within this tradition, the jury does not function as a "mere procedural formality, but a fundamental reservation of power in our constitutional structure. Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary."
 
 Blakely v. Washington,
 

 542 U.S. 296
 
 , 305-06,
 
 124 S.Ct. 2531
 
 ,
 
 159 L.Ed.2d 403
 
 (2004). Ordinary citizens, John Adams wrote, "should have as complete a control ... in every judgment of a court of judicature" as in the legislature.
 

 Id.
 

 at 306
 
 ,
 
 124 S.Ct. 2531
 
 (quoting in parenthetical John Adams, Diary Entry (Feb. 12, 1771),
 
 reprinted in
 
 2 Works of John Adams 252, 253 (C. Adams ed. 1850)).
 
 [16]
 

 As the "democratical balance in the Judiciary power,"
 
 [17]
 
 the jury system secured to the citizenry "a share of Judicature which they have reserved for themselves."
 
 [18]
 
 From this perspective, "the common man in the jury box, no less than the citizen in the
 voting booth, was central to a democratic theory that asserted the sovereignty of the people through self-government." Ronald J. Bacigal,
 
 Putting the People Back into the Fourth Amendment,
 

 62 Geo. Wash. L. Rev. 359
 
 , 409 (1994).
 
 [19]
 
 Because of its unique role within our democracy, the jury remains to this day a "cornerstone of Anglo-American judicial procedure."
 
 Glossip v. Gross,
 
 ---U.S. ----, ----,
 
 135 S.Ct. 2726
 
 , 2748,
 
 192 L.Ed.2d 761
 
 (2015) (Scalia, J., concurring).
 

 Could we ask for a more worthy canon of construction than the constitutional bias in favor of the "ancient trial by jury" and the declared will of the People that it "is preferable to any other" manner of trial? Virginia's Declaration of Rights, § 11, 9 Hening's Statutes of Virginia 109, 111-12 (1776);
 
 see also
 
 Va. Const. art. I, § 11. Is there any better meta-canon to rule over the lesser canons of constructions that rely almost entirely on linguistics, syntax, and assumptions about ideal draftsmanship?
 

 III.
 

 In short, I believe that the term "court" in Code § 38.2-209(A) is ambiguous because reasonable interpreters could read it to include a jury or, conversely, to exclude a jury. Picking solely from these opposing views seems to me to miss the forest for the trees. The legal timberland of the Commonwealth was planted by arborists who considered the citizen jury as sacred. If any reasonable statutory construction exists to preserve this "preferable" method of deciding disputes, Va. Const. art. 1, § 11, it should prevail over all the others. Only by following this interpretative path can
 we preserve "in the hands of the people that share which they ought to have in the administration of public justice." Blackstone,
 
 supra,
 
 at *380.
 

 For these reasons, I respectfully dissent.
 

 See generally
 
 John H. Langbein,
 
 The Disappearance of Civil Trial in the United States,
 

 122 Yale L.J. 522
 
 , 524 (2012) (citing statistics showing that, in 2002, 1.2% of federal civil filings terminated in jury trials and 0.6% of state court dispositions ended in jury trials). We have experienced a similar trend in Virginia. In 1999, 1.9% of all civil cases filed in Virginia circuit courts were concluded by a jury trial.
 
 See
 
 Office of the Executive Secretary, Supreme Court of Virginia, State of the Judiciary Report, at A-37 & tbl. 17 (2008). By 2012, that percentage dropped to 0.6%.
 
 See
 
 Office of the Executive Secretary, State of the Judiciary Report, Supreme Court of Virginia, at A-16 & tbl. 11 (2012).
 

 See, e.g.,
 
 1 Benjamin V. Abbott, Dictionary of Terms and Phrases Used in American or English Jurisprudence 301 (1879) ("a tribunal of justice; an authority organized to hear and determine controversies in the exercise of judicial power"); James A. Ballentine, A Law Dictionary 95 (1916) ( "[p]ersons officially assembled under authority of law, for the administration of justice"); Henry C. Black, A Law Dictionary 284 (2d ed.1910) ("[t]he place where justice is judicially administered"); 1 John Bouvier, A Law Dictionary 325 (6th rev. ed. 1856) ("a place where justice is judicially administered" (citing Coke,
 
 supra,
 
 at 58)); Richard Burn, A New Law Dictionary 203 (1792) (same); 1 Arthur English, A Dictionary of Words and Phrases Used in Ancient and Modern Law 226 (Beard Books 2000) (1898) ("[a] place where justice is administered in accordance with legal forms and principles"); Stephen H. Gifis, Barron's Law Dictionary (6th ed.2010) ("[t]he branch of government which is responsible for the resolution of disputes under the law of the government"); 2 Words and Phrases 650-51 (3d ed.1928) (collecting cases interpreting "court" to "ordinarily designate[ ] the tribunal itself, including its constituent parts of judge and jury").
 

 1 Abbott,
 
 supra
 
 note 2, at 302 ("The term court may be construed to mean the judges of the court, or to include the judges and jury, according to the connection and the object of its use." (citation omitted)); English,
 
 supra
 
 note 2, at 226 ("Court" denotes "[t]he judge, judges, or the judge and jury when the court is in session."); 2 Words and Phrases,
 
 supra
 
 note 2, at 650 ("[T]he statute provides that the 'court' shall allow a reasonable attorney's fee.... The word, 'court' however, was doubtless used by the Legislature in the broader sense as including both judge and jury or judge alone, according as the 'court' may be constituted when the trial occurs.").
 

 Justice James Wilson was a signer of the Declaration of Independence, a principal drafter of Article III of the United States Constitution, and an inaugural member of the United States Supreme Court.
 
 See generally
 
 William Ewald,
 
 James Wilson and the Drafting of the Constitution,
 

 10 U. Pa. J. Const. L. 901
 
 , 901, 915, 1004-05 (2008).
 

 See also
 

 Feltner v. Columbia Pictures TV, Inc.,
 

 523 U.S. 340
 
 , 356,
 
 118 S.Ct. 1279
 
 ,
 
 140 L.Ed.2d 438
 
 (1998) (Scalia, J., concurring) ("In common legal parlance, the word 'court' can mean 'the judge or judges, as distinguished from the counsel or jury.' But it also has a broader meaning, which includes both judge and jury." (citations omitted));
 
 Sibley v. Fulton DeKalb Collection Serv.,
 

 677 F.2d 830
 
 , 832, 834 (11th Cir.1982) (holding that the term "court" in the statutory phrase, "in such amount as the court may allow," refers to trial by both judge and jury and not only to trial by judge alone).
 

 See, e.g.,
 
 Code §§ 2.2-3006(B), 3.2-5216, 3.2-5414(A), 8.01-52, 8.01-519, 8.01-581. 20(B), 9.1-405, 10.1-1437(A), 11-8, 15.2-717, 15.2-1507(A)(9)(b), 15.2-1607, 15.2-1654, 15.2-1812.2(B), 15.2-2135(A), 15.2-2411, 15.2-3000, 15.2-3104, 18.2-10(e), 18.2-10(f), 18.2-15, 18.2-22(a)(3), 18.2-54, 18.2-56.1(B), 18.2-56.1(D), 18.2-61(C), 18.2-67.1(C), 18.2-67.2(C), 18.2-91, 18.2-95, 18.2-153, 18.2-155, 18.2-248.5(A), 18.2-384, 19.2-244, 19.2-283, 19.2298.01(C), 21-126, 22.1-314, 32.1-314(A), 33.2-1103, 45.1-161.322(B), 46.2-357(B)(2), 46.2-391(D)(2)(a), 51.1-124.13(B), 55-326, 56-522, 58.1-1825(D), 58.1-3709(B), 58.1-3984(A), 59.1-41.6, 63.2-507(B);
 
 see also
 
 Code §§ 8.01-680 ("court without the intervention of a jury"); 16.1-272 ("court shall fix the sentence without the intervention of a jury"); 19.2-257 ("court shall hear and determine the case without the intervention of a jury"); 19.2-258 (same); 19.2-258.1 (same); 19.2-400 ("in cases to be tried without a jury, before the court begins to hear or receive evidence").
 

 See, e.g.,
 
 Code §§ 2.2-1839, 4.1-323, 5.1-13, 6.2-201, 8.01-53(B), 8.01-54(B), 8.01-55, 8.01-106, 8.01-107, 8.01-120, 8.01-158, 8.01-159, 8.01-166, 8.01-188, 8.01-194, 8.01-229(A)(2)(b), 8.01-267.6, 8.01-336, 8.01-360, 8.01-361, 8.01-362, 8.01-374, 8.01-374.1, 8.01-377, 8.01-379.3, 8.01-380(A), 8.01-381, 8.01-382, 8.01-383, 8.01-383.1, 8.01-403, 8.01-417.1, 8.01-423, 8.01-430, 8.01-565, 8.01-573, 8.01-576.1, 8.01-576.2, 8.01-576.3, 8.01-581.7(A), 8.01-643, 11-4, 16.1-113, 18.2-61(B), 18.2-67.5:1, 18.2-248(C), 18.2-268.10(D), 18.2-386.1(E), 18.2-457, 19.2-219, 19.2-231, 19.2-262(A), 19.2-264, 19.2-264.1, 19.2-264.2, 19.2-264.3(A), 19.2-264.3:1(F)(2), 19.2-264.4, 19.2-266.1, 19.2-268, 19.2-271.2, 19.2-291, 19.2-295, 19.2-295.1, 19.2-295.3, 19.2-307, 19.2-339, 19.2-386.10, 25.1-219, 25.1-318, 29.1-738.2(E), 29.1-810(B), 36-96.16(C), 36-96.17(E), 36-96.18(C), 37.2-908, 38.2-807, 46.2-341.26:4, 46.2-341.26:10(D), 46.2-942, 46.2-943, 53.1-55, 53.1-156, 55-153, 55-177, 55-178, 55-238, 59.1-130, 61.1-61, 64.2-446(B), 64.2-448(E), 64.2-1212(B), 64.2-2007, 65.2-819, 65.2-1006(D).
 

 See, e.g.,
 
 Code §§ 38.2-1506(C) ("Action on the petition may be taken by the
 
 court or a judge
 
 of the court." (emphasis added)); 38.2-2405 ("Any fidelity and surety insurer shall be accepted as surety upon any bond required by ... any court, judge, public officer, board, or organization upon presentation of evidence satisfactory to the court, judge, or other officer."); 38.2-2409 ("Assets shall be ... held in a manner that prevents the withdrawal ... without an order of a
 
 court or a judge,
 
 made on any notice to the surety which the
 
 court or judge
 
 directs." (emphasis added)); 38.2-2410 ("Any court, judge or other officer ... shall ... allow a sum for the expense.");
 
 see also
 
 Code §§ 18.2-67.7(C) (referring to "court" broadly and explicitly recognizing the constituent parts of "judge" and "jury"); 18.2-67.9(B) (same); 19.2-154 (same); 19.2-303 (acknowledging implicitly that a jury is a constituent part of "court" by permitting the court, "whether with or without jury," to suspend the imposition of a sentence).
 

 If the term "court" truly had a "commonly accepted definition" that rendered the statute unambiguous,
 
 ante
 
 at ----, 776 S.E.2d at 812, neither the majority nor I should be consulting legislative history at all. We would instead just consult our favored dictionary and be done with it.
 
 See, e.g.,
 

 Clark v. Strother,
 

 238 Va. 533
 
 , 541,
 
 385 S.E.2d 578
 
 , 582 (1989) (relying solely on a dictionary for a word's "commonly accepted" meaning);
 
 Roanoke City Sch. Bd. v. Times-World Co.,
 

 226 Va. 185
 
 , 192,
 
 307 S.E.2d 256
 
 , 259 (1983) (relying only on two dictionaries);
 
 Suggs v. Life Ins. Co. of Va.,
 

 207 Va. 7
 
 , 11,
 
 147 S.E.2d 707
 
 , 710 (1966) (finding no "ambiguity" in a term that has a "commonly accepted definition"). As we have often said, "When the language of an enactment is free from ambiguity, resort to legislative history and extrinsic facts is not permitted because we take the words as written to determine their meaning."
 
 Virginia Broad. Corp. v. Commonwealth,
 

 286 Va. 239
 
 , 249,
 
 749 S.E.2d 313
 
 , 318 (2013) (alteration omitted) (quoting
 
 Brown v. Lukhard,
 

 229 Va. 316
 
 , 321,
 
 330 S.E.2d 84
 
 , 87 (1985) ).
 

 This presumption can be rebutted when a recodification makes no substantive change in law.
 
 See, e.g.,
 

 Newberry Station Homeowners Ass'n v. Board of Supervisors,
 

 285 Va. 604
 
 , 617-18,
 
 740 S.E.2d 548
 
 , 555-56 (2013) (finding no change in law when drafting note expressly stated that the recodification did not intend to effect
 
 any
 
 substantive change and when General Assembly adopted all of the Code Commission's recommended language without amendment);
 
 Waldrop v. Commonwealth,
 

 255 Va. 210
 
 , 214,
 
 495 S.E.2d 822
 
 , 825 (1998) (finding no change in law where "nothing in the Recodified Act suggests an intent to make substantive changes in the Act" and where the Report of the Code Commission stated "the goal of [the] recodification is a clearer, more easily understood set of election laws and the elimination of ambiguities in the present law
 
 rather than substantive changes in the law.
 
 " (emphasis added)) (quoting
 
 Report of the Virginia Code Commission on the Recodification of Title 24.1 of the Code of Virginia,
 
 S. Doc. No. 25 (1993)). Furthermore, "courts do not give much, if any, weight to section headings, comments, or notes where they were inserted by the compiler or publisher for convenience of reference." 2A Norman J. Singer & J.D. Shambie Singer, Statutes and Statutory Construction § 47:14, at 346 (7th rev. ed.2014).
 

 Virginia Code Commission,
 
 Report of the Virginia Code Commission on the Revision of Title 38.1 of the Code of Virginia,
 
 H. Doc. No. 17, at 1 (1986).
 

 See
 

 State Farm Mut. Auto. Ins. Co. v. Major,
 

 239 Va. 375
 
 , 377-79,
 
 389 S.E.2d 307
 
 , 309 (1990) (finding a "plainly indicate[d]" legislative intent "to alter the substantive meaning of the recodified provision" of the insurance law from "the change in language in the recodified provision," notwithstanding the absence of a "revisors' note" designating the revision as substantive).
 

 "The common law of England was the common law of Colonial Virginia, and after the Revolution became the common law of the Commonwealth."
 
 Miller v. Commonwealth,
 

 159 Va. 924
 
 , 931,
 
 166 S.E. 557
 
 , 559 (1932) ;
 
 see also
 

 United States Fid. & Guar. Co. v. Carter,
 

 161 Va. 381
 
 , 387-89,
 
 170 S.E. 764
 
 , 765-66 (1933) (reaffirming that Virginia adopted English common law "as understood at the time of the American Revolution");
 
 Briggs v. Commonwealth,
 

 82 Va. 554
 
 , 557 (1886) (recognizing the export of English common law to Colonial Virginia and the Commonwealth's official adoption of it following the Revolution);
 
 Taylor v. Commonwealth,
 

 58 Va.App. 435
 
 , 443-46,
 
 710 S.E.2d 518
 
 , 522-24 (2011) (acknowledging the adoption and reach of English common law in the Commonwealth); W. Hamilton Bryson,
 
 English Common Law in Virginia,
 
 6 J. Legal Hist. 249, 251 (1985) (noting that "the common law was brought from England to Virginia in 1607").
 

 Akhil Reed Amar & Les Adams, The Bill of Rights Primer 138 (2002) (quoting John Taylor, An Inquiry into the Principles and Policy of the Government of the United States 209 (W. Stark ed., 1950) (1814)).
 

 Id.
 

 (quoting Essays by a Farmer (IV),
 
 reprinted in
 
 5 The Complete Anti-Federalist 36, 38 (Herbert J. Storing ed., 1981)).
 
 See generally
 
 Akhil Reed Amar, The Bill of Rights: Creation and Reconstruction 11, 81-118 (1998).
 

 With characteristic hyperbole, Jefferson was even more emphatic: "Were I called upon to decide whether the people had best be omitted in the Legislative or Judiciary department, I would say it is better to leave them out of the Legislative."
 
 Blakely,
 

 542 U.S. at 306
 
 ,
 
 124 S.Ct. 2531
 
 (quoting in parenthetical Letter from Thomas Jefferson to the Abbé Arnoux (July 19, 1789),
 
 reprinted in
 
 15 Papers of Thomas Jefferson 282, 283 (J. Boyd ed.1958)).
 

 Amar, The Bill of Rights: Creation and Reconstruction 95 (quoting Essays by Hampden,
 
 reprinted in
 
 4 The Complete Anti-Federalist,
 
 supra
 
 note 15, at 198, 200).
 

 Id.
 
 at 94 (quoting Wythe Hold,
 
 "
 

 The Federal Courts Have Enemies in All Who Fear Their Influence on State Objects": The Failure to Abolish Supreme Court Circuit-Riding in the Judiciary Acts of 1792 and 1793,
 

 36 Buff. L. Rev. 301
 
 , 325 (1987)).
 

 See also
 
 1 Alexis De Tocqueville, Democracy in America 362 (Henry Reeve trans., 3d ed. 1863) ("The system of the jury, as it is understood in America, appears to be as direct and as extreme a consequence of the sovereignty of the people as universal suffrage.");
 
 see generally
 

 id.
 

 at 358-67
 
 (discussing trial by jury as a democratic "political institution" in the United States).